David M. GREEN

v.

GEORGE L. SMITH II GEORGIA WORLD CONGRESS CENTER AUTHORITY and Dan Graveline, Individually and in his executive capacity.

No. CivA1:96–CV–1603–ODE.

United States District Court, N.D. Georgia, Atlanta Division.

Dec. 11, 1997.

Verley J. Spivey, Linda Ann Klein, Gambrell & Stolz, Atlanta, GA, for Plaintiff.

Timothy J. Sweeney, Harman, Owen, Saunders & Sweeney, Atlanta, GA, for Defendants.

## ORDER

ORINDA D. EVANS, District Judge.

This civil action, in which Plaintiff seeks compensatory and punitive damages pursuant to federal employment statutes, is before the court on Defendants' motion for summary judgment and Plaintiff's motion for summary judgment. The parties have filed responses to the respective motions before the court.

Defendant George L. Smith II World Congress Center Authority (the "Authority") hired Plaintiff on or about July 7, 1989. Plaintiff was initially employed in the Events Services Department preparing signs, but was later promoted to the Engineering Department as a Maintenance Engineer.

According to Plaintiff, in 1984, he was diagnosed with bipolar disorder while he was institutionalized for ninety days in a state facility in Pennsylvania for a manic episode he experienced. In 1985, Plaintiff experienced a recurrence and was again institutionalized for ninety days. In April 1994, and during the course of his employment with Defendants, but without Defendants' knowledge, Plaintiff became delusional and began hearing voices.

The Authority's Policy and Procedure on Employee Disciplinary Guidelines contains a "no show-no-call" policy under which an employee can, inter alia, be discharged if he or she is absent from work for four days and

does not call in during that four day period to explain why he or she is absent. Although Plaintiff contends that this "policy has been enforced loosely and haphazardly throughout Plaintiff's employment with the Authority," (Pl.'s Statement of Material Facts as to which there are Genuine Issues to be Tried at 3), Defendants maintain that the policy is strongly enforced and its effectiveness is important to the Center." (Defs.' Statement of Material Facts as to which there are No Genuine Issues to be Tried at ¶ 7). Indeed, according to Defendants between January 1993 and September 1995, twenty-two employees have been terminated under the "no show-no call" policy. (Id.).

In any event, on April 20, 1994, Plaintiff walked off from his job before lunch time without notifying anyone, and he did not return to work the rest of the working day. Similarly, on April 21 and 22, 1994, Plaintiff did not report to work or call in to explain his absence.

On the night of April 22, 1994, Rod Brannon, the Manager of Utility Services, phoned Plaintiff at his home to determine whether he intended to return to work. During their conversation, Brannon told Plaintiff that his absence without calling violated established policy. According to Plaintiff, he informed Brannon that he was mentally fatigued or mentally not 100 percent, but that he would return to work on April 23, 1994. Defendants maintain that Plaintiff told Brannon that he had been absent because he was having personal problems with a woman whom he had met at the tennis court and that he did not feel like coming to work. Defendant further contends that Plaintiff did not mention that he had a mental disability and did not request "reasonable accommodations" in order to perform his work duties. Plaintiff does not dispute this assertion nor does he dispute Defendants' contention that he informed Brannon that he would return to work the following day. Plaintiff, however, did not report to work the following day.

Although Plaintiff was scheduled to work on April 21, 22, 23, 24, and 25, 1994, he was not only absent from work on each of these days, but he also failed to call in and explain the reason for the absences. Plaintiff's supervisor, Rod Brannon reported Plaintiff's absences to Plaintiff's department head, Jerry Lewis, and both Brannon and Lewis recommended that Plaintiff be discharged for the attendance violations.

On April 26, 1994, this recommendation was presented to John Smith, the General Manager of the Authority; Smith, however, deferred the recommended termination so that the Authority could further investigate Plaintiff's unauthorized absences. Although Smith believed that termination was the appropriate action, he, instead, instituted an investigation in order to determine Plaintiff's whereabouts.[1]

On April 26, 1994, the Authority Personnel Manager, Crystal Senterfitt, contacted Plaintiff's father, Olen Green ("Green"), in an attempt to locate Plaintiff. Green informed Senterfitt that Plaintiff was in jail and had been arrested for arson. Green contends that Senterfitt asked him if Plaintiff had a history of mental illness, and Green responded that Plaintiff was mentally ill, had a history of mental illness, and had been diagnosed as a schizophrenic.

After her conversation with Green, Senterfitt contacted Lt. R.K. Awana, an arson investigator with the Atlanta Fire Department; Lt. Awana informed Senterfitt that she had arrested Plaintiff at 10:00 a.m. on April 25, 1994 and charged him with the April 24, 1994 arson of his residence. The Authority learned that Plaintiff was to undergo a psychological evaluation for the purpose of determining his competency to stand trial; the results of this evaluation were to be reported on May 10, 1994.

On April 26, 1994, Senterfitt informed the Authority of Plaintiff's status. That same day, the Authority placed Plaintiff on contingent leave with pay so that it could further investigate Plaintiff's absences from work and his arrest for arson.

---

1. The facts in this paragraph and the preceding paragraph were taken from paragraphs twelve and thirteen of Defendants' statement of material facts as to which there is no dispute.

Thereafter, Senterfitt spoke with Plaintiff while he was in jail. According to Defendants, Plaintiff informed Senterfitt that the reason he missed work was due to "girl troubles." Although Plaintiff denies using the phrase "girl troubles," he does not deny that he may have said something along those lines. (Pl.'s Depo. at 47). Plaintiff, however, does not dispute Defendants' assertion that Plaintiff did not inform Senterfitt that he was mentally disabled or needed a "reasonable accommodation" in order to perform his work duties.

During Senterfitt's discussions with Lt. Awana, Senterfitt learned that Plaintiff was arrested for the arson of his residence on April 25, 1994, and thus was not in jail on April 21, 22, 23, or 24, 1994, days on which he was scheduled to work.

On May 10, 1994, the Authority learned that Plaintiff had been determined competent to stand trial. The Authority then concluded that Plaintiff's absences and failure to call in were not attributable to any disability or other sufficient explanation. The Authority decided to discharge Plaintiff in accordance with the department head's original recommendation. Plaintiff's termination was also allegedly based upon Plaintiff's felony charges of arson. According to Defendants, the Authority believed that an arsonist may pose a direct threat the health and safety of the Center, its employees, and guests. On May 12, 1994, Plaintiff was informed of his termination during a meeting at the Center with Jerry Lewis.

On October 3, 1994, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). After receiving notice of his right to sue, Plaintiff filed suit in federal court on June 25, 1996. In his three count complaint, Plaintiff alleges that Defendants violated the Americans with Disabilities Act, as amended ("ADA"), 42 U.S.C. §§ 12101–12213, the Re-

habilitation Act of 1973, ("Rehabilitation Act"), 29 U.S.C. §§ 701–797b, and his rights under the fourteenth amendment to the United States Constitution. After engaging in the discovery process, both sides filed the summary judgment motions that are pending before the court.

The court will grant summary judgment if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby. Inc.,* 477 U.S. 242, 248, 254, 106 S.Ct. 2505, 2510, 2513, 91 L.Ed.2d 202 (1986). Under Fed.R.Civ.P. 56(c), summary judgment is mandated against a party who, after adequate discovery, "fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2551, 91 L.Ed.2d 265 (1986). While the evidence and factual inferences are to be viewed in a light most favorable to the non-moving party, *Rollins v. TechSouth, Inc.,* 833 F.2d 1525, 1529 (11th Cir.1987), the non-moving party is required to do "more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Because Defendants' motion for summary judgment was the first filed, the court turns to a discussion of this motion.[2]

The ADA was enacted "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). To that end, Congress made it unlawful for a covered entity to discriminate "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and

**2.** Because Plaintiff offers no argument or evidence to rebut Defendants' assertion that Plaintiff's Rehabilitation Act claim, constitutional claim, and claims against Defendant Graveline in his individual capacity should be dismissed, the court dismisses these claims without further discussion.

privileges of employment." 42 U.S.C. § 12112(a).

■ To establish a prima facie case of unlawful disability discrimination, a plaintiff must show that: 1) he is disabled; 2) otherwise qualified for the position; and 3) was subjected to unlawful discrimination because of his disability. *Morisky v. Broward County,* 80 F.3d 445, 447–49 (11th Cir.1996). In the instant case, assuming without deciding that Plaintiff has presented sufficient evidence with respect to elements one and two his prima facie case, the court concludes that Plaintiff has presented insufficient evidence with respect to three.

■ Plaintiff contends that Defendants discriminated against him by failing to reasonably accommodate his disability. Under 42 U.S.C. § 12112(b)(5)(A), the term "discriminate" includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or an employee...." Here, it is undisputed that Plaintiff walked off from his job on April 20, 1994 without notifying anyone. Although he was scheduled to work on April 21 and 22, 1994, he neither reported to work nor called in to explain his absence. When he was contacted at home by Rod Brannon on the night of April 22, 1994, Plaintiff stated that he was mentally fatigued or mentally not 100 percent, but that he would return to work the following day, April 23, 1994. Despite this commitment, however, and despite being scheduled to work on April 23, 24, and 25, 1994, Plaintiff failed to attend work or call in on each of these days. On April 26, 1994, Plaintiff's father, Olen Green, allegedly informed Crystal Senterfitt that Plaintiff was mentally ill, had a history of mental illness, and had been diagnosed as a schizophrenic. Because, however, Defendants did not become aware of Plaintiff's mental condition until, at the earliest, the day on which Senterfitt spoke with Plaintiff's father, the court concludes that Defendants did not "know" of Plaintiff's disability for ADA purposes until April 26, 1994, which was after Plaintiff violated the "no show-no call" policy.[3] Thus, the issue the court must address is whether the ADA requires Defendants to expunge Plaintiff's violation of the "no show-no call" policy, although Defendant had insufficient knowledge of Plaintiff's disability when the violation occurred. Stated differently, does the ADA mandate a retroactive accommodation of Plaintiff's disability. After a review of relevant case law, the court concludes that it does not.

In *Senate Sergeant at Arms v. Senate Fair Employment Practices,* 95 F.3d 1102, 1104 (Fed.Cir.1996), the Plaintiff, a United States Senate employee who suffered from the disabilities of alcoholism and depression, was disciplined for attendance problems and violation of a "call-off" rule, a rule requiring employees who request unscheduled leave to do so at least one hour before their shifts are to begin. More specifically, between July 1991 and October 25, 1993, Plaintiff failed to comply with the "call-off" rule on fourteen occasions. *Id.* After receiving several notices of discipline, Plaintiff was warned that if he received one more such notice, his removal would be recommended. *Id.* On October 28, 1993, however, Plaintiff received another notice of discipline for violating the "call-off" rule. *Id.* Upon receiving this notice, the plaintiff, for the first time, informed his supervisor that he was an alcoholic and that it was alcoholism that caused him to violate the "call-off" rule. *Id.* When plaintiff and his employer were unable to reach an agreement as to the appropriate course of action to take, the employer imposed a "last-chance agreement," which, inter alia, provided for plaintiff's participation in a substance dependency program, but contained no provisions for ret-

---

**3.** Although Plaintiff informed Brannon that he was mentally fatigued or not mentally 100 percent, there is no evidence that Plaintiff attributed his mental state to a disability or impairment for which a reasonable accommodation was needed. Indeed, Plaintiff informed Brannon that he would return to work the following day. After considering this evidence, the court concludes that Plaintiff's statement to Brannon regarding his mental state was insufficient to place Defendants on notice of Plaintiff's disability.

roactive relief. *Id.* Thereafter, Plaintiff filed an employment discrimination complaint with Office of Senate Fair Employment Practices Independent Hearing Board (the "Board") under the Government Employee Rights Act ("GERA"), which, inter alia, incorporates into its provisions the ADA and other federal employment discrimination statutes.[4] *Id.*

In reviewing his claim, the Board found that plaintiff's employer became aware of plaintiff's alcoholism on October 28, 1993, before it proposed the discipline of removal and imposed the "last-chance agreement." *Id.* The Board concluded, however, that plaintiff's employer did not reasonably accommodate plaintiff's alcoholism disability, because it did not provide him with a "firm choice and a fresh start," meaning that "he was entitled to a choice between treatment and discipline and that, if he chose treatment, prior discipline would be rescinded and all documentation of the discipline would be purged from his personnel file." *Id.*

On appeal, the United States Court of Appeals for the Federal Circuit addressed a question that is substantially similar to the one before the court, that is, "whether the GERA requires the employer to provide a retroactive accommodation consisting of a 'firm choice and fresh start' for a qualified individual with a disability of alcoholism." *Id* at 1105. In answering this question in the negative, the Federal Circuit stated:

> [T]he ADA requires that a covered entity provide a reasonable accommodation for the *known* disability of a qualified individual with a disability. The entity's duty to accommodate arises only when it knows of a disability, and its duty is therefore pro-

spective from the time when it gained knowledge of the disability. Requiring retroactive accommodation would mean that an entity would be required to accommodate an employee before it had knowledge of the disability, or when it only had partial, speculative, or hearsay knowledge. That would be contrary to the plain meaning of the statute, which indicates that an entity's duty to accommodate is triggered by its knowledge of the disability.

*Id.* at 1107.

Applying this principle to the facts of this case results in the conclusion that although Defendants were aware of Plaintiff's disability at the time of Plaintiff's termination, May 12, 1994, Defendants were not required to reasonably accommodate Plaintiff by excusing the misconduct of Plaintiff that occurred prior to the day on which Defendants became aware of Plaintiff's disability, April 26, 1994. As the Federal Circuit stated in *Senate Sergeant at Arms*, 95 F.3d at 1108, the ADA provides that, "until the employer is made aware of the disability, the duty to accommodate does not arise." Consequently, because Defendants were not required to reasonably accommodate Plaintiff's disability by excusing his noncompliance with the "no show-no call" policy, the court holds that Defendants' motion for summary judgment should be granted.[5]

Accordingly, Defendants' motion for summary judgment [# 13] is hereby GRANTED; and Plaintiff's motion for summary judgment [# 19] is hereby DENIED.

SO ORDERED.

---

4. This case is unique from the "routine" discrimination case because different procedures apply when Senate employees challenge alleged discrimination. For a description of these procedures *see Johnson v. Office of Senate Fair Employment Practices*, 35 F.3d 1566, 1567–68 (Fed. Cir.1994).

5. Because neither Lloyd Graves nor Joseph Sibley engaged in conduct similar to the conduct engaged in by Plaintiff, the court rejects Plaintiff's argument that these two individuals are proper comparators. *See Jones v. Gerwens*, 874

F.2d 1534, 1540 (11th Cir.1989) ("in cases involving alleged racial bias in the application of discipline for violation of work rules, the plaintiff ... must show either (a) that he did not violate the work rule, or (b) that he engaged in misconduct similar to that of a person outside the protected class, and that the disciplinary measures enforced against him were more severe than those enforced against the other persons who engaged in similar misconduct.") (citation omitted).